**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DONNA CONRAD, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| VIRGIN MOBILE USA, INC., a Delaware Corporation, FLYCELL, INC., a Delaware Corporation, | ) ) ) ) |
| Defendants. | ) ) ) |

FILED: SEPTEMBER 2, 2008
08CV4986
JUDGE DOW
MAGISTRATE JUDGE COX
EDA

Case No. _____

**JURY TRIAL DEMANDED**

**FLYCELL, INC.'S NOTICE OF REMOVAL**

Defendant Flycell, Inc. ("Flycell") hereby gives notice of removal to this Court of Case No. 08CH27521 in the Circuit Court of the Cook County, Illinois, Chancery Division. This notice is filed pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453. As grounds for removal, Defendant Flycell states:

1.      Plaintiff Donna Conrad ("Conrad") has filed a putative Class Action Complaint ("Complaint") in which she asserts various statutory and common law claims against Defendants Virgin Mobile USA, Inc. ("Virgin") and Flycell, all based on allegations relating to "unauthorized charges for premium mobile content" products and services in the cellular telephone industry. Compl. at ¶ 8, *see also* Counts I – IV.

2.      Conrad filed the Complaint on July 29, 2008. Conrad served the Summons and Complaint: (i) on Virgin on August 1, 2008; and (ii) on Flycell on August 1, 2008.

3.      This Notice of Removal is timely-filed within 30 days of service of the Complaint.  28 U.S.C. § 1446(b).

4.      This is a civil action over which the Court has original jurisdiction under 28 U.S.C. § 1332.  The Court has diversity jurisdiction over this putative class action pursuant to the Class Action Fairness Act ("CAFA"), which has been codified at various parts of the United States Code, including 28 U.S.C. § 1332(d) and § 1453.

5.      CAFA expanded federal diversity jurisdiction for class actions.  Under CAFA, federal jurisdiction exists over a (putative) class action if (a) there is "minimal diversity," which means that at least *one* class member (named or unnamed) must be a citizen of a state that is different than the state of citizenship of *any* defendant; and (b) the case involves an aggregate amount in controversy of at least $5 million, exclusive of interest and costs, but including actual damages, attorneys' fees, and the cost of complying with injunctive relief.  28 U.S.C. §§ 1332(d)(2), (d)(6); *see also Hart v. FedEx Ground Package System, Inc.*, 457 F.3d 675, 677, 679 (7th Cir. 2006) (diversity jurisdiction rule under CAFA); *Tropp v. Western-Southern Life Ins. Co.*, 381 F.3d 591, 595 (7th Cir. 2004) (noting that the amount in controversy includes money damages, attorneys' fees, and the cost of compliance with an injunction).

6.      Minimal diversity is satisfied in this case because Conrad is a citizen of a state other than the state of citizenship of at least one of the Defendants.  Virgin is a citizen of Delaware and New Jersey for purposes of diversity jurisdiction as it is a Delaware corporation, with its principle place of business headquartered in New Jersey.  Compl. at ¶ 2.  Similarly, Flycell is a citizen of Delaware and New York for purposes of diversity jurisdiction as it is a Delaware corporation, with its principle place of business headquartered in New York.  Compl. at ¶ 3.  On information and belief, Conrad is a citizen of Illinois.  *Cf.* Compl. at ¶ 1 (alleging that

Conrad is a "resident" of Illinois).  Moreover, this is a putative class action in which Conrad seeks to represent two classes of individuals: (1) a class (the "Virgin Class") "consisting of all wireless telephone subscribers *in the state of Illinois* who have suffered losses or damages as a result of unauthorized Virgin billing for mobile content products and services;" and (2) a class ("the Flycell Class") "consisting of all wireless telephone subscribers *in the nation* who suffered losses or damages as a result of unauthorized Flycell billing for mobile content products and services."  Compl. at ¶ 52 (emphasis added).  Thus, on information and belief, and in light of the scope of the Virgin Class and Flycell Class definitions alleged by Conrad, there is at least one putative member of each class who is not a citizen of the state of which Flycell is a citizen.

7.    Although Conrad has not alleged the amount in controversy in this case, the amount in controversy plainly exceeds $5 million (excluding interest and costs).  The Complaint seeks to recover, among other things: (1) all charges to all wireless telephone subscribers *in the nation* assessed by or on behalf of Flycell (apparently through any wireless carrier, not solely Virgin) for unauthorized mobile content products and services, plus (2) all amounts billed by Virgin to all wireless telephone subscribers in Illinois for unauthorized mobile content products and services.  This proposed nationwide class is alleged to be of "large numbers of people" whom Flycell has "for years … been billing … for the purchase of products and services not agreed to by those customers."  Compl. at ¶¶ 14, 43, 44.  As a result, the Complaint alleges that both Virgin and Flycell have "profited significantly" through their alleged conduct.  Compl. at ¶¶ 14, 39.

8.    Furthermore, Flycell has realized revenue from billed wireless telephone subscribers nationwide well in excess of $5 million per year for the years 2006, 2007 and is likewise projected as such for 2008.  Therefore, when taken in its entirety, it is plain that the

amount in controversy in this case is well in excess of $5 million. *See, e.g., Panter v. Alltel Corp.*, 2008 U.S. Dist. Lexis 53323 (N.D. Ill. July 11, 2008).

9.     Defendant Flycell contends that Conrad and the putative class members each have zero damages and that it would not be proper to certify any class. By asserting that the amount in controversy exceeds $5 million, Defendant Flycell does not admit or concede that Conrad or any putative class member actually has suffered damages or is entitled to recover any money from Defendants. The operative issue for removal purposes is the potential amount of the controversy put at issue by plaintiff's claims. *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005) ("The demonstration concerns what the plaintiff is claiming (and thus the amount in controversy between the parties), not whether plaintiff is likely to win or be awarded everything he seeks."); *see also Oshana v. Coca-Cola Co.*, 2006 WL 3816041, at *5 (7th Cir. Dec. 29, 2006) ("Whether [plaintiff] *actually* recovers more than $75,000 is immaterial; what matters is the amount put in controversy on the day of removal.") (emphasis in original).

10.     In sum, this Court has jurisdiction because there is minimal diversity and the amount in controversy is satisfied.

11.     As required by 28 U.S.C. § 1446(a), a complete copy of all process, pleadings, and orders served upon Defendant Flycell in the state court action are attached as Ex. A to this Notice.

12.     Concurrently with the filing of this Notice, Defendant Flycell has provided written notice of removal to all adverse parties and has filed a copy of this Notice of Removal with the clerk of the Circuit Court of Cook County, Illinois, Chancery Division pursuant to 28 U.S.C. § 1446(d).

13.     Defendant Flycell reserves the right to amend or supplement this notice of removal.

14.     Defendant Flycell requests a trial by a jury of all issues.

Dated:  September 2, 2008

Respectfully submitted,

**FLYCELL, INC.**

/s/Norman K. Beck

_____

Norman K. Beck   #6228825
James F. Herbison  #6275116
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois  60601-5600
Phone:  (312) 558-5600
Fax:  (312) 558-5700
nbeck@winston.com
jherbison@winston.com

*Attorneys for Flycell, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney for Defendant Flycell, Inc. hereby certifies that a copy of the foregoing FLYCELL, INC.'S NOTICE OF REMOVAL was served on September 2, 2008 on the following counsel by hand delivery and Federal Express as follows:

Myles McGuire
Ethan Preston
Ryan Andrews
KamberEdelson, LLC
53 West Jackson Blvd.
Suite 550
Chicago, Illinois 60604

Mark E. Rakoczy
Edward M. Crane
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, Illinois 60606

Dated:  September 2, 2008

/s/Norman K. Beck
_____

Norman K. Beck
James F. Herbison
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois  60601-5600
Phone:  (312) 558-5600
Fax:  (312) 558-5700
nbeck@winston.com
jherbison@winston.com

*Attorneys for Flycell, Inc.*

08CV4986
JUDGE DOW
MAGISTRATE JUDGE COX
EDA

# EXHIBIT A

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | |
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| **SUMMONS** | **ALIAS - SUMMONS** | **CCG N001-10M-1-07-05 (            )** |

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, _CHANCERY_ DIVISION**

(Name all parties)

Donna Conrad

v.

Virgin Mobile USA, Inc. and Flycell, Inc.

No. **08CH27521**

YCS&T SERVICES LLC
RECEIVED

AUG 1 2008

**SUMMONS**

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room _8 0 2_, Chicago, Illinois 60602

| | | |
|---|---|---|
| ☐ **District 2 - Skokie**<br>5600 Old Orchard Rd.<br>Skokie, IL 60077 | ☐ **District 3 - Rolling Meadows**<br>2121 Euclid<br>Rolling Meadows, IL 60008 | ☐ **District 4 - Maywood**<br>1500 Maybrook Ave.<br>Maywood, IL 60153 |
| ☐ **District 5 - Bridgeview**<br>10220 S. 76th Ave.<br>Bridgeview, IL 60455 | ☐ **District 6 - Markham**<br>16501 S. Kedzie Pkwy.<br>Markham, IL 60426 | ☐ **Child Support**<br>28 North Clark St., Room 200<br>Chicago, Illinois 60602 |

**You must file within 30 days after service of this Summons, not counting the day of service.**
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: _44146_

Name: _Myles McGuire_

Atty. for: _Plaintiff_

Address: _53 West Jackson Boulevard, Ste. 1530_

City/State/Zip: _Chicago, Illinois 60604_

Telephone: _(312) 589-6370_

Service by Facsimile Transmission will be accepted at: _____

WITNESS, _JUL 2 9 2008_ , _____

**DOROTHY BROWN**
CLERK OF CIRCUIT COURT
Clerk of Court

Date of service: _____
(To be inserted by officer on copy left with defendant or other person)

_____
(Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |  |
|---|---|---|
| DONNA CONRAD, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) | |
| Plaintiff, | ) ) | No. **08CH27521** |
| v. | ) ) ) | |
| VIRGIN MOBILE USA, INC., a Delaware Corporation, FLYCELL, INC., a Delaware Corporation, | ) ) ) ) | |
| | ) | **Jury Trial Demanded** |
| Defendants. | ) | |

------------------------------------------------------------x

### CLASS ACTION COMPLAINT

Plaintiff Donna Conrad brings this class action complaint against Defendants Virgin Mobile USA, Inc. and Flycell, Inc., seeking to stop the Defendants' unlawful practice of charging cellular telephone customers for products and services that they have not authorized, a practice that has resulted in the Defendants unlawfully collecting money from consumers throughout the state of Illinois and the nation, and to obtain redress for all persons injured by such conduct. Plaintiff, for her class action complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and as to all other matters, upon information and belief, including investigation conducted by her attorneys.

### PARTIES

1.      Plaintiff Donna Conrad is a resident of Illinois.

2.      Defendant Virgin Mobile USA, Inc. ("Virgin") is a provider of cellular telephone service in the United States. Virgin is a Delaware corporation headquartered in New Jersey.

1

Virgin does business throughout the nation, including in Cook County, Illinois. Virgin operates through sister entities and/or predecessors or successors in interest, whose true identities will be ascertained following discovery and who are liable for herein alleged conduct and charges.

3.     Defendant Flycell, Inc. ("Flycell") is a provider of mobile content in the United States. Flycell is a Delaware corporation headquartered in New York. Flycell does business throughout the nation including in Cook County, Illinois.

## VENUE

4.     Venue is proper in Cook County because the Defendants do business in Cook County.

## CONDUCT COMPLAINED OF

5.     This case arises from two closely related phenomena. The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and receive text messages, including – most significantly for present purposes – "premium" text message services. These services, also known as "mobile content," include products that range from the basic (customized ringtones for use with cell phones, sports score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities (such as direct payment services, interactive radio, and participatory television).

6.     The second underlying phenomenon of this case constitutes its very core. That is, just as providers of premium mobile content, such as the Defendants, deliver their products by means of cell phone technology, they likewise charge and collect from their customers by "piggybacking" on the cell phone bills sent out by wireless carriers. Further, because the mobile content providers by themselves most often lack the wherewithal to negotiate the necessary relationships with the much larger wireless carriers, they do so with the help of third-party

2

companies known as aggregators. These aggregators act as middlemen, representing numerous mobile content providers in arriving at the agreements that allow them to use the billing and collection mechanisms of the wireless carriers. In turn, both the aggregators and the wireless carriers are compensated for their services by retaining a substantial percentage of the amount received from each transaction.

7.     The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it. That flaw – understood, perpetuated, and even encouraged by carriers, aggregators, affiliate marketers, and major licensors of copyrighted music such as the instant Defendants – is an open secret within the industry, but little understood outside of it. In short, the billing and collection systems established by companies such as the Defendants, in aiding and enriching the premium mobile content industry, are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

8.     As the Defendants also know, significant amounts of money have been collected on account of such unauthorized charges for premium mobile content in the industry over the last few years. And while it has always been within the power of companies such as the Defendants to institute simple and effective measures that would prevent this, they have instead knowingly maintained the very system that has allowed these erroneous charges. Indeed, the Defendants have reaped and retained their shares of the improper collections.

9.     While the total sales of premium mobile content in 2008 amount to a significant sum, the business is still in its infancy. The burgeoning industry has already expanded from ordinary ringtones into mass media-related products, such as interactive radio, participatory voting at television and concert events, and, most recently, services that enable cell phones to

3

function as credit cards.  Unchecked, the Defendants' practices will injure an ever-increasing number of unwitting consumers.

**Flycell's Role in the Scheme to Defraud**

10.      Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only thing a mobile content provider such as Defendant Flycell needs in order to charge a consumer for its products is the consumer's cellular telephone number.  Once a mobile content provider has a consumer's cell phone number, it can cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them.

11.      Mobile content providers such as Defendant Flycell can simply provide that cellular phone number, along with an amount to be charged, to a billing aggregator.  The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that number.  The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information.

12.      Because the protections normally present in consumer transactions – such as signatures and private credit card numbers – are absent from this process, the likelihood of false charges increases enormously.  Furthermore, because a substantial part of mobile content "sales" are effected through web sites using misleading, oblique, or inadequately explained "consent" procedures, that likelihood increases by another order of magnitude.  Mobile content providers such as Flycell have powerful financial incentives to collect as many cell phone numbers as possible, but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

4

13.     As it also knows, Flycell routinely processes charges for mobile content that have not been authorized by the charged party.

14.     As a result, Flycell has, for years, systematically, repeatedly, and without authorization, been billing its customers for the purchase of products and services not agreed to by those customers. Flycell and third-party service providers have, on information and belief, profited significantly through this practice.

15.     Defendant Flycell cooperates with numerous other companies in this scheme to defraud, including aggregators, copyright licensors, and affiliate marketers.

### Aggregators' Role in the Scheme to Defraud

16.     In order to tap into the emerging wireless content marketplace and make content services available to wireless consumers, content providers must first obtain access to wireless carriers' mobile communications networks, frequently by "partnering" with aggregators – intermediary companies that offer content providers (their "content provider partners") direct access to the carriers through existing relationships. This allows content providers to focus on developing and marketing branded content, applications, and programs, while aggregators manage the complex carrier relationships, distribution, billing, and customer service.

17.     Aggregators operate mobile transaction networks that help companies develop, deliver, and bill for mobile content services to compatible mobile devices throughout the state of Illinois and the nation.

18.     By using their end-to-end technology platforms, their relationships with U.S. carriers, and other value-added services, these aggregators have forged a crucial link between wireless carriers and mobile content providers. They have enabled the transformation of wireless

technology into a marketing, content delivery, and collections process, while carving out a

profitable role for themselves as very crucial middlemen in this rapidly growing industry.

19.    Aggregators have developed a vast distribution system that integrates into the

wireless networks of some of the largest wireless carriers nationwide, providing direct

connections to hundreds of mobile operators.

20.    While aggregators charge their content provider customers some upfront fees,

their revenue is primarily generated through a "revenue share" on transactions for which they bill

cell phone subscribers:  Each time a charge is incurred in connection with the purchase of mobile

content services, the aggregator and/or the content provider causes said charge to be billed

directly to the cellular telephone bill of the carrier's customer who currently owns and/or uses

the telephone number (claimed to be) associated with said purchase.

21.    The carrier then bills and collects the charge from its current subscriber, retains a

portion of the proceeds as its "revenue share," and remits the balance to the aggregator who has

direct access to its network and who retains a percentage of the balance in the form of its own

"revenue share."  The aggregator then remits the remainder directly to the mobile content

provider (or, in some instances, to another aggregator who retains a percentage of the balance in

the form of its own "revenue share" and remits the balance to its mobile content provider client).

22.    In the United States, aggregators have registered numerous transactions,

processed significant amounts of money in transactions, and profited greatly from the

arrangement with their industry partners in recent years.

### Copyright Licensors' Role in the Scheme to Defraud

23.    Since the advent of customized cellular telephone ringers, the demand for mobile

content based on copyrighted music has grown exponentially and today accounts for a significant

percentage of all mobile content providers' revenue, including that of Defendant Flycell. In order to tap into such demand, mobile content providers must first obtain permission from the copyright owners of the music that is to be sold as ringtones.

24.     Owners of copyrighted music, such as Universal Music Group, Inc., among many others, have licensed parts of their libraries of copyrighted music to numerous mobile content providers, including Defendant Flycell, for the latter to sell to consumers in the form of ringtones. This arrangement allows Flycell to focus on developing and marketing content, applications, and programs based on the copyrighted music, while allowing the copyright owners to remain silent partners operating primarily in the background.

25.     While copyright owners are ordinarily compensated by their content provider partners such as Flycell through upfront fees, their revenue is frequently generated through a "revenue share" or "equity share" based on mobile content transactions involving their copyrighted material: Each time a charge is incurred in connection with the purchase of its copyrighted mobile content, the content provider causes that charge to be billed directly to the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

26.     Licensors have, in Illinois and throughout the nation, registered numerous transactions and processed significant amounts of money over recent years, profiting greatly from their arrangements with their industry partners.

27.     Licensors have not only sanctioned illegal billing, they have actively promoted it by negotiating and facilitating partnerships between themselves and mobile-content providers, such as Defendant Flycell, and by failing to maintain adequate safeguards to prevent

7

unauthorized charges.  Despite their knowledge of the illegal practices and lack of reliable

safeguards, Licensors continue to collect revenue from the sale of unauthorized mobile content.

### Affiliate Marketers' Role in the Scheme to Defraud

28.    Affiliate marketers are internet advertising networks that provide a distribution

platform for mobile content providers' products and services.

29.    Advertising is an essential step in the mobile content ecosystem.  Without the

ability to drive users to their websites, mobile content providers such as Flycell would be unable

to earn virtually any revenue, no matter how misleading or fraudulent their services.  Absent

advertising through these so-called affiliate marketers, the fraudulent mobile content providers

would have significantly fewer visitors to their websites and their illegal revenues would drop

dramatically.

30.    Many affiliate marketers with whom mobile content providers contract, including

on information and belief Defendant Flycell, fail to clearly and accurately disclose a host of

highly relevant information to consumers about purchasing mobile content, such as the service's

price, subscription period, and cancellation procedures.

31.    Indeed, many affiliate marketers specifically employ anti-consumer practices

simply to achieve the next "sale," including so-called "negative options," which involve the

practice of presenting a consumer with an opportunity to consent in advance to continue to

receive products or services in the future until cancelled.  In such situations, the seller frequently

interprets the consumer's silence or failure to take an affirmative action to reject goods or

services, or to cancel the sales agreement, as an agreement to continue to receive the offer, when

in fact the consumer intends just the opposite.  Moreover, one of the mobile content industry's

largest affiliate marketers, Epic Advertising, Inc. f/k/a Azoogleads US, Inc. ("Azoogle"),

recently settled claims brought against it by the Office of the Attorney General of the State of Florida for deceptively marketing mobile content through a negative option rubric.

32.    Defendant Flycell knows affiliate marketers are loathe to adequately disclose the relevant information about purchasing mobile content for fear of scaring off potential customers. Fortunately for deceptive affiliate marketers, however, Flycell has systematically declined to require those with whom it contracts to obtain consumers' true advance consent before causing such consumers to be billed.

## Virgin's Role in the Scheme to Defraud

33.    Virgin uses uniform form contracts ("Service Agreements") under which customers purchase cell phone services.

34.    As described above, Virgin's services include providing access to and billing for various third-party mobile content services, such as ringtones, chat services, horoscopes, stock tips, weather alerts, participatory television, mobile payment services, and other forms of software provided by third-party vendors.

35.    Virgin has contracted with third-party providers to bill and collect from Virgin's customers the services provided by third-party content providers, the charges of which are included directly on customers' monthly wireless bills.

36.    The duty of good faith and fair dealing, a part of every contract, requires that Virgin not bill any customer for any good or service not authorized by the customer.

37.    Upon execution of said Service Agreements and activation of cellular telephone accounts, Virgin provides its customers a ten-digit cellular telephone number.

38.    As explained above, unbeknownst to its customers, Virgin frequently charges consumers for services that were never authorized.

9

39.    As a result, Virgin has, for years, systematically, repeatedly, and without authorization, been billing its customers for the purchase of products and services not agreed to by those customers. Virgin and third-party service providers have, on information and belief, profited significantly through this practice.

40.    Virgin's conduct is by no means accidental. As previously alleged, it knows that many of its cellular telephone customers dispute the mobile content providers' claims that such customers consented to be charged for their mobile content services. Virgin further knows that it cannot authenticate such customers' authority to be billed for such mobile content charges. In light of its knowledge of these facts, Virgin's decision to continue to charge its customers for mobile content, without taking steps to authenticate the representations of the mobile content providers that the customers' authority to be charged was obtained, constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

41.    Because the amount Virgin is taking is small on an individual basis – as little as a few dollars to at most several hundreds of dollars per person – and because of Virgin's vast resources and superior bargaining power, the Defendants employ this scheme with the hope and expectation that their illegal conduct will go unpunished.

42.    Indeed, if the Defendants wanted to end this illegal billing, they could do so in an instant. All they would have to do to ensure that they are obtaining the consent of the charged party would be to agree to process a unique "access code" for each customer account, provided by the carrier to the account holder and his/her authorized representatives at the time it is opened, and require that it be produced anytime a third-party attempts to charge the account. If a matching access code is not provided, no charges would be included on the customer's billing statement.

10

43.    But, instead of implementing such a simple safeguard, the Defendants have intentionally created, maintained, and promoted a system that encourages fraud at every step. Such a system constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

44.    The Defendants' conduct is by no means accidental. As previously alleged, they know that many of their cellular telephone customers dispute claims of consent to be charged for mobile content services. The Defendants further know that they cannot authenticate such customers' authority to be billed for mobile content. In light of their knowledge of these facts, the Defendants' decision to continue to charge their customers for mobile content without taking steps to authenticate the representations of customer authentication constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

45.    Because the amount that the Defendants are taking is small on an individual basis – as little as a few dollars to at most several hundreds of dollars per person – the Defendants employ this scheme with the hope and expectation that their illegal conduct will go unpunished.

**THE FACTS RELATING TO THE NAMED PLAINTIFF**

46.    In or about 2006, a new cell phone service was purchased by the Plaintiff from an authorized representative of Virgin.

47.    On that same day, in exchange for a cellular telephone service plan, the Plaintiff agreed to pay Virgin a monthly fee.

48.    In or about 2008, the Plaintiff's cell phone account was charged for unauthorized mobile content services from Defendant Flycell.

11

49.    At no time did the Plaintiff authorize the purchase of the products and services offered by the Defendants, nor did the Plaintiff consent to the receipt of text messages to her cellular telephone.

50.    At no time did the Plaintiff authorize the Defendants or anyone else to bill her for these services.

51.    The Defendants have yet to provide the Plaintiff a full refund for the unauthorized charges (i.e. premium text message charges, ordinary text message charges, data charges, back interest), nor an assurance that such unauthorized charges will not appear in future billing periods.

## CLASS ALLEGATIONS

52.    The Plaintiff brings this action on behalf of herself and two Classes, defined as follows:

(a) a class ("Virgin Class") consisting of all wireless telephone subscribers in the state of Illinois who have suffered losses or damages as a result of unauthorized Virgin billing for mobile content products and services; provided, however, that the following are excluded from this proposed Class: (i) the Defendants, and (ii) any employee of the Defendants;

(b) a class (the "Flycell Class") consisting of all wireless telephone subscribers in the nation who suffered losses or damages as a result of unauthorized Flycell billing for mobile content products and services; provided, however, that the following are excluded from this proposed Class: (i) the Defendants, and (ii) any employee of Defendants;

53.    The Plaintiff's claims are typical of the claims of the other members of the Classes.

12

54.    The Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes. The Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. The Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and they have the financial resources to do so. Neither the Plaintiff nor her counsel have any interest adverse to those of the other members of the Classes.

55.    Most members of the Classes would find the cost of litigating their individual claims to be prohibitive, and they would, therefore, have no effective remedy absent a class action. Class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Judiciary and the litigants and promotes consistency and efficiency of adjudication.

56.    The Defendants have acted and failed to act on grounds generally applicable to the Plaintiff and the other members of the Classes, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the other members of the Classes.

57.    The factual and legal bases of the Defendants' liability to the Plaintiff and the other members of the Classes are the same, resulting in injury to the Plaintiff and to the other members of the Classes. The Plaintiff and the other members of the Classes have all suffered harm and damages as a result of the Defendants' unlawful and wrongful conduct.

58.    There are many questions of law and fact common to the claims of the Plaintiff and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Virgin Class include but are not limited to the following:

(a)    Whether Virgin's conduct described herein is in breach of contract.

13

      (b)      Whether Virgin's conduct described herein is consumer fraud.

Common questions for the Flycell Class include but are not limited to the following:

      (a)      Whether Flycell's conduct described herein is unjust enrichment.

      (b)      Whether Flycell's conduct described herein is tortious interference with a

contract.

## COUNT I
### (Breach of Contract on Behalf of the Virgin Class)

59.      The Plaintiff incorporates by reference the foregoing allegations.

60.      The Plaintiff and the Class entered into substantially identical agreements with Defendant Virgin, whereby the Plaintiff and the Class agreed to pay a certain sum of money in exchange for Virgin's activation of the Plaintiff and Class's cellular telephone accounts and its promise to provide various communication and related services to the Plaintiff and the Class.

61.      Virgin expressly and/or impliedly agreed to provide the Plaintiff and the Class with cellular telephone numbers free of unauthorized charges for third-party products and services.

62.      Virgin further expressly and/or impliedly agreed to bill the Plaintiff and the Class only for products or services the purchase of which they had authorized.

63.      Virgin further expressly and/or impliedly agreed to carry out its obligations in good faith and fair dealing.

64.      Virgin breached its contractual obligations by providing the Plaintiff and the Class with cellular telephone accounts that included unauthorized charges for mobile content.

14

65.　　Virgin further breached its contractual obligations, including its contractual obligation of good faith and fair dealing, by thereafter billing the Plaintiff and the Class for products or services, the purchase of which they never authorized.

66.　　The aforementioned breaches of contract have proximately caused the Plaintiff and the other members of the Class economic injury and other damages.

**COUNT II**
**(Violations of the Illinois Consumer Fraud and**
**Deceptive Business Practices Act on Behalf of the Virgin Class)**

67.　　The Plaintiff incorporates by reference the foregoing allegations.

68.　　Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") declares as unlawful "any [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

69.　　The Defendant violated, and continues to violate, this proscription through its conduct as alleged above.

70.　　The Defendant, through its acts of unfair competition, has obtained money from the Plaintiff and the members of the proposed Class. The Plaintiff and the members of the Class ask that this Court restore this money to the Plaintiff and the Class and enjoin the Defendant from continuing its illegal practices.

71.　　Such conduct is ongoing and continues to this date. The Plaintiff, the Class members, and the general public are therefore entitled to the relief described herein.

## COUNT III
### (Restitution/Unjust Enrichment on Behalf of the Flycell Class)

72.    The Plaintiff incorporates by reference the foregoing allegations.

73.    A benefit has been conferred upon Flycell by the Plaintiff and the Class.  Flycell has received and retained money belonging to the Plaintiff and the Class resulting from its billing and collecting of unauthorized third party mobile content charges.

74.    Flycell appreciates or has knowledge of said benefit.

75.    Under principles of equity and good conscience, Flycell should not be permitted to retain the money belonging to the Plaintiff and the Class that Flycell has unjustly received as a result of its actions.

## COUNT IV
### (Tortious Interference with a Contract on Behalf of the Flycell Class)

76.    The Plaintiff incorporates by reference the foregoing allegations.

77.    The Plaintiff and the Class had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services to the Plaintiff and the Class and to bill the Plaintiff and the Class only for products or services the purchase of which they authorized.

78.    Flycell knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

79.    Flycell intentionally interfered with said contractual relationship through improper motives and/or means by knowingly and/or recklessly continually causing to be placed on the cellular telephone bills of cellular telephone owners across the nation unauthorized charges.

16

80.     The Plaintiff and the Class suffered loss as a direct result of the conduct of Flycell.

WHEREFORE, Plaintiff Donna Conrad, on behalf of herself and the Classes, prays for the following relief:

a.     Certify this case as a class action on behalf of the Classes as defined above and appoint Donna Conrad as Class Representative, and appoint the undersigned as lead counsel;

b.     Declare that the actions of Flycell, as set out above, constitute unjust enrichment and tortious interference with a contract;

c.     Enter judgment against Flycell for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct;

d.     Declare that the actions of Virgin, as set out above, constitute breach of contract and violate the Illinois Consumer Fraud and Deceptive Business Practices Act;

e.     Enter judgment against Virgin for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct;

f.     Award the Plaintiff and the Classes pre- and post-judgment interest;

g.     Enter judgment for injunctive, statutory, and/or declaratory relief as is necessary to protect the interests of the Plaintiff and the Classes;

h.     Award such other and further relief as equity and justice may require.

17

**JURY DEMAND**

The Plaintiff requests a trial by jury of all claims that can be so tried.


Dated: July 29, 2008

Respectfully submitted,


DONNA CONRAD, individually and
on behalf of a class of similarly situated individuals

One of her attorneys


Myles McGuire
Ethan Preston
Ryan Andrews
KAMBEREDELSON, LLC
53 West Jackson Blvd.
Suite 550
Chicago, Illinois 60604
Telephone: (312) 589-6370
Firm ID: 44146

18

Division of Corporations - Online Services

Page 1 of 1

 **State of Delaware**
The Official Website for the First State 

Visit the Governor  |  General Assembly  |  Courts  |  Other Elected Officials  |  Federal, State & Local Sites

State Directory  |  Help  |  Search Delaware [            ] [GO]          Citizen Services  |  Business Services  |  Visitor Info.

**Department of State: Division of Corporations**

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status
Validate Certificate

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

Frequently Asked Questions    View Search Results

## Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | 3673893 | Incorporation Date / Formation Date: (mm/dd/yyyy) | 06/24/2003 |
| Entity Name: | FLYCELL, INC. | | |
| Entity Kind: | CORPORATION | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |

*YCS&T SERVICES LLC RECEIVED AUG 1 2008*

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | YCS&T SERVICES LLC | | |
| Address: | 1000 WEST STREET BRANDYWINE BLDG., 17TH FLOOR | | |
| City: | WILMINGTON | County: | NEW CASTLE |
| State: | DE | Postal Code: | 19801 |
| Phone: | (302)571-6668 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ◯ Status ◯ Status,Tax & History Information [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

site map  |  about this site  |  contact us  |  translate  |  delaware.gov